**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RONALD C. EVANS; DENNIS TREADAWAY, | No.    18-15094 |
| Plaintiffs-Appellants, | D.C. No. 2:17-cv-01123-WBS-DB |
| v. | |
| ZB, N.A., DBA California Bank & Trust, | MEMORANDUM* |
| Defendant-Appellee. | |

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted April 15, 2019
San Francisco, California

Before:  D.W. NELSON, BEA, and N.R. SMITH, Circuit Judges.

Ronald Evans and Dennis Treadaway ("Plaintiffs") appeal the district

court's dismissal of their diversity action against California Bank and Trust

("CB&T") under Federal Rule of Civil Procedure 12(b)(6).  We have jurisdiction

under 28 U.S.C. § 1291.  We reverse, vacate, and remand for further proceedings.

---

\*       This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Plaintiffs' class action against CB&T alleges the bank knowingly assisted a $125 million fraudulent scheme initiated by International Manufacturing Group, Inc. ("IMG"), one of CB&T's clients. Plaintiffs assert eight claims under California law: (1) aiding and abetting fraud; (2) securities fraud (under California Corporations Code sections 25110, 25401, and 25504.1); (3) conspiracy to commit fraud; (4) aiding and abetting conversion; (5) aiding and abetting breach of fiduciary duty; (6) intentional interference with contract; (7) negligence; (8) violation of California Penal Code section 496; and (9) conspiracy to violate California Penal Code section 496.[1]

The district court dismissed the entire suit on the ground that Plaintiffs had not pleaded sufficient facts giving rise to a plausible inference that CB&T knew IMG was misappropriating funds. On de novo review of the district court's Rule 12(b)(6) dismissal, we must "accept a plaintiff's allegations as true and construe them in the light most favorable to the plaintiff, dismissing the complaint only if it fails to state a claim to relief that is plausible on its face." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016) (internal citation and quotation marks omitted).

---

[1] Plaintiffs voluntarily dismissed their claim for aiding and abetting conversion.

1.      Under California law, banks generally owe no duty to non-customers like Plaintiffs. *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 409 (Ct. App. 2005). However, California law recognizes an exception: when a bank knows a customer is perpetrating fraud, it may not assist the customer accomplish the tort. *S. Tr. & Commerce Bank v. San Diego Sav. Bank*, 212 P. 385, 388 (Cal. Ct. App. 1922). Accordingly, if a bank "knowingly makes itself a party to a fraud, [it] must make good the loss that results from the misappropriation." *Id.* at 386 (citation omitted); *Casey*, 26 Cal. Rptr. 3d at 405 (explaining that California law creates liability when the bank "knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act").

Thus, we first determine whether Plaintiffs' 44-page complaint specifically alleges that CB&T knew IMG was misrepresenting itself as a legitimate business and misappropriating funds, and whether Plaintiffs have alleged specific supporting facts that make their allegations of actual knowledge plausible. We note that all parties agree IMG *was* operating a Ponzi scheme. IMG's CEO, Deepal Wannakuwatte, told banks and investors that IMG had a $100-million contract with the U.S. Department of Veterans' Affairs ("VA") to provide medical gloves at facilities around the country—subject only to his ability to raise capital to purchase or import the gloves from Asia. CB&T issued millions of dollars in loans

3

to IMG to finance its alleged business (importing latex gloves from Asia) and also maintained several of IMG's deposit accounts. But the latex glove business was a sham. IMG siphoned money from later investors to pay back loans from banks and disperse lulling payments to earlier investors. IMG's bank, CB&T, stopped loaning IMG money in 2009, but continued to operate IMG's deposit accounts and disperse funds. Eventually, the scheme collapsed. Wannakuwatte pleaded guilty to wire fraud charges in 2014, and IMG declared bankruptcy shortly thereafter.

Plaintiffs allege that, by 2009, CB&T had discovered IMG was operating a fraud on investors—there was no latex glove business. Rather than terminate the relationship, Plaintiffs allege CB&T helped IMG defraud investors to generate fees, interest, and funds to repay itself. Plaintiffs allege CB&T knew IMG's entire "wholesale import business" was a sham, because CB&T knew that IMG had virtually no income from its latex glove import business. We find this allegation plausible. When IMG failed to timely repay CB&T on the Jamestown Health and Medical Supply Company ("JHMS") credit line, the bank created a "lock-box" account and required IMG/JHMS to deposit all funds paid for importing latex gloves directly into the lock-box account—but Plaintiffs allege there were virtually no deposits into that account. That is, CB&T knew there were no payments, proceeds, or other distributions from the sale of latex gloves because of a lack of

4

deposits into the lock-box account. The dissent argues that banks have no duty to supervise activity occurring on their customers' accounts. However, the lock-box account belonged to CB&T (the bank), not IMG (the customer). More importantly, the question isn't whether CB&T had a *duty* to supervise the account—the question is whether Plaintiffs allege CB&T *actually did* monitor the account. Not only do Plaintiffs plausibly allege CB&T was monitoring that lock-box account, because the money deposited there was to be paid to CB&T, Plaintiffs allege that CB&T extended the maturity date of the JHMS credit line after creating the lock-box (which would have been unnecessary if CB&T thought IMG had fully repaid the JHMS credit line).

Plaintiffs specifically allege that CB&T knew IMG was misappropriating funds, because CB&T knew it was being repaid with investor funds (and not revenue from sales of latex gloves). This allegation is plausible, because Plaintiffs allege CB&T knew there was no income from latex glove sales. Further, Plaintiffs allege the bank monitored IMG's accounts and actually traced a multi-million

dollar loan repayment to specific deposits by investors into IMG's wholesale account #4841.[2]

The complaint alleges IMG promised investors that their money would fund the purchase of shipments of latex surgical gloves from Asia, and that in so doing, investors were financing IMG's highly profitable wholesale inventory purchases—not repaying IMG's loans to CB&T or making payments to earlier investors. Plaintiffs allege CB&T knew that IMG was misrepresenting its business, because it knew IMG was promising high rates of return to individuals who thought they were funding IMG's importation or purchase of medical supplies, when CB&T also knew IMG generated no income from latex sales.

Plaintiffs allege CB&T repeatedly departed from standard industry practices, including repeatedly making advances at IMG's request without obtaining supporting documentation or verifying that IMG used the advanced proceeds appropriately (despite indications to the contrary) and extending maturity dates on short-term loans year after year (even when IMG was in default). Plaintiffs

---

[2] The dissent raises the argument (on CB&T's behalf) that the loan repayment CB&T traced was actually money that IMG solicited from investors as a "bridge loan." We are unpersuaded. Plaintiffs expressly allege that IMG solicited money from investors to fund its importation or purchase of medical supplies, not a loan repayment. Our review on a motion to dismiss simply does not involve making inferences in favor of the defendant. *Schueneman*, 840 F.3d at 704.

plausibly allege CB&T helped facilitate IMG's solicitation of cash, because CB&T knew IMG needed that money to pay down the advances from CB&T. Plaintiffs allege CB&T even solicited its own clients to invest, instructed the investors not to interfere with the repayment process IMG had set up, and arranged for any late fees to be covered by IMG "to fully convince the two investors they should not meddle with the loans secured by their own homes." The dissent misunderstands these factual allegations, which provide examples of how CB&T "actively participated" in the scheme and "accommodated [IMG] by using atypical banking procedures." *See Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1121 (C.D. Cal. 2003); *Casey*, 26 Cal. Rptr. 3d at 408–09 (relying on *Neilson*).

CB&T argues that we should ignore Plaintiffs' allegations that CB&T repeatedly extended maturity dates on its loans despite ballooning debt, because we should infer that it conducted due diligence and took conventional actions. We cannot make that inference in CB&T's favor on a motion to dismiss. *Schueneman,* 840 F.3d at 704. If anything, CB&T's representation that it conducted audits before granting extensions per federal regulations requiring CB&T to ensure IMG had sufficient resources to meet its obligations, *see* 12 C.F.R. § 1.5(b), cuts against CB&T. Coupling CB&T's alleged investigation into IMG's business income with the allegation that, by fall 2009, CB&T decided to

terminate its lending relationship (because there was no repayment on the outstanding balances), we can reasonably infer CB&T knew there was no income from latex gloves sales.

In light of all of these specific allegations concerning CB&T's actual knowledge of IMG's misappropriation and fraud, we reverse the district court's dismissal of the case.

2.    Instead, Plaintiffs plausibly state three claims for relief.

a.    First, Plaintiffs state a claim for aiding and abetting fraud (Claim 1), because they allege that CB&T: (a) knew IMG was defrauding investors, and (b) gave substantial assistance to IMG. *See Casey*, 26 Cal. Rptr. 3d at 406; *Neilson*, 290 F. Supp. 2d at 1111.[3] As explained above, Plaintiffs plausibly allege CB&T knew IMG was making false representations to investors. Plaintiffs' allegations of CB&T's involvement exceed the "'ordinary business transactions' a

---

[3] CB&T argues that Plaintiffs have not adequately pleaded the underlying fraud (i.e., IMG's misrepresentations to investors) with adequate specificity. However, there is no question Wannakuwatte was defrauding investors. In fact, it was CB&T who introduced Wannakuwatte's Plea Agreement for fraud into the record before the district court, wherein Wannakuwatte admitted making false representations to his investors regarding IMG's business with the VA (to make it seem like a good investment). We leave open the possibility of an amendment on remand.

bank performs for a customer [that] can satisfy the substantial assistance element" under California law. *See Casey*, 26 Cal. Rptr. 3d at 406.

b.      Plaintiffs state a claim for aiding and abetting IMG's breach of fiduciary duty (Claim 5), because they allege that CB&T: (a) knew IMG was misappropriating investors' funds; and (b) gave substantial assistance to IMG. *See id.* at 406, 411. For example, Plaintiffs allege that CB&T knew it was being repaid with investor funds (and not revenue from sales of latex gloves), because it traced a multi-million dollar loan repayment to an investor in IMG's wholesale account #4841. Again, CB&T's "ordinary business transactions" for IMG satisfies the substantial assistance element. *See id.* at 406.

c.      Plaintiffs state a claim for a conspiracy to commit fraud (Claim 3), which requires: (a) the formation and operation of the conspiracy; (b) wrongful conduct in furtherance of the conspiracy; and (c) damages arising from the wrongful conduct. *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016) (citing *Kidron v. Movie Acquisition Corp.*, 47 Cal. Rptr. 2d 752 (Ct. App. 1995)). Plaintiffs have alleged that CB&T agreed to terminate the lending relationship in 2009, but keep IMG's wholesale depository account open for long enough for CB&T to get fully repaid and hide the connection between the Ponzi scheme and repayment from it. Plaintiffs also allege they were harmed by CB&T's

9

wrongful conduct, because, even after CB&T had traced its loan repayment to an investor deposit, it continued to receive new investor funds and disperse them to older investors as lulling payments. Plaintiffs also allege CB&T perpetrated fraud by, among other things: (1) submitting bogus purchase orders to Bank of America ("BofA") to draw down a federally-backed line of credit after it looked like BofA was going to cancel it;[4] and (2) soliciting bank clients to invest in IMG and handling the investment paperwork for two home loans.[5]

3.      We have made clear that district courts commit reversible error by dismissing a suit without any chance to amend, even if no request were made,

---

[4] Plaintiffs also allege CB&T knew the purchase orders were bogus. IMG told CB&T ahead of time that it would forward CB&T "new" purchase orders, but all of the amounts outstanding on the JHMS credit line were from old purchase orders. Plaintiffs allege CB&T and IMG had arranged, ahead of the JHMS line draw-down, to submit any purchase orders it could get from Wannakuwatte the instant it became clear BofA wouldn't renew the line of credit. Plaintiffs allege that, in May 2009, CB&T's Vice President received a copy of the JHMS standby letter of credit with the handwritten instruction "any p/o ok per Buzz." "P/o" referred to purchase orders CB&T was required to submit to draw down the line of credit, and "Buzz" was Buzz Minson, a director in CB&T's San Francisco office. Plaintiffs allege that immediately after BofA decided to let the JHMS line lapse, CB&T immediately presented enough purchase orders to draw down the full $9 million of credit. ER 507. Plaintiffs allege Jamestown Tribe and BofA were immediately suspicious; a BofA employee told the Tribe to "get your auditors in the door."

[5] CB&T argues that Plaintiffs' failure to meet the requirements of Rule 9 vis-a-vis their fraud claim precludes their claim for conspiracy to commit fraud. For the reasons in footnote 3, we reject this argument.

unless it determines additional facts could not possibly cure the deficiency. *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018). Accordingly, we vacate the district court's order dismissing the suit, so it may consider leave to amend on remand (including allowing an amendment to provide additional factual allegations supporting Claims 1, 3, and 5).

4. CB&T urges us to affirm the district court on alternate grounds: the untimeliness of the complaint. The district court did not consider whether the statute of limitations would preclude bringing these claims. Because such an analysis would involve factual determinations, we leave it for the district court to consider on remand.

**REVERSED, VACATED**, and **REMANDED**.

*Evans v. ZB, N.A.*, 18-15094

Bea, Circuit Judge, dissenting:

The panel majority's decision makes the same mistake as the complaint: it assumes that a conclusory allegation of knowledge—repeated again and again—meets this court's pleading standard. ("Plaintiffs allege CB&T knew IMG's entire "wholesale import business" was a sham, *because CB&T knew* that IMG had virtually no income from its latex glove import business. We find this allegation plausible.") (emphasis added); ("Plaintiffs specifically allege that CB&T knew IMG was misappropriating funds . . . [t]his allegation is plausible, *because Plaintiffs allege CB&T knew* there was no income from latex glove sales.") (emphasis added); ("Plaintiffs plausibly allege CB&T helped facilitate IMG's solicitation of cash, *because CB&T knew* IMG needed that money to pay down the advances from CB&T.") (emphasis added). But the law requires facts, not "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Strip away these bare allegations, and we are left with three facts—none of which give rise to the plausible inference that CB&T had "actual knowledge" of IMG's Ponzi scheme. *See Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1145 (2005).

1. First, the "lock-box" account. Not only have courts in California long held that banks have no duty to "supervise account activity," *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 481 (Ct. App.

1996), there are actually no allegations as to the activity in the "lock-box" account to begin with. Contrary to what the panel majority states, the plaintiffs merely allege that CB&T created an account, and that IMG promised to deposit "payment[s], proceeds or other distribution[s]" received from the Jamestown Health & Medical Supply Company (JHMS) into it. That does not give rise to the inference that CB&T knew what funds, if any, were deposited—much less that CB&T knew that IMG was operating a Ponzi scheme.

2. Second, the tracing of the loan repayment to an investor. Businesses often solicit loans to cover their existing obligations. This is known as a bridge loan, *see In re Daisy Sys. Corp.*, 97 F.3d 1171, 1175 n.3 (9th Cir. 1996), and it is quite common. Unlike a bridge loan, a Ponzi scheme requires a fraud on the investor—but there are no specific allegations of the bank's actual knowledge of such a fraud here. If the allegation that a bank knew a loan was repaid with investor funds is enough to expose that bank to liability, nearly every American bank would be liable for aiding and abetting fraud.

3. Third, the allegation that—as the panel majority puts it—CB&T "solicited its own clients to invest" in IMG. This is both factually misleading and beside the point. What the plaintiffs *actually* allege is that CB&T arranged home equity lines of credit for two of its clients so they could invest in IMG in 2006. But according to the plaintiffs, CB&T didn't discover the Ponzi scheme until 2009, so "actual

knowledge" arising from those lines of credit is impossible. And besides, arranging lines of credit on behalf of a client—like setting up a "lock-box" account or paying off a loan with funds from an investor—is simply another common bank practice turned into a source of liability by the panel majority. To say that this falls short of giving rise to an inference that the bank had actual knowledge of IMG's Ponzi scheme would be an understatement.

The panel majority reverses the district court "[i]n light of all these specific allegations concerning CB&T's actual knowledge." There are no specific allegations here. What we really have is a sympathetic case, a vague and lengthy complaint, and a series of common banking practices dressed up in ominous language. California courts find "actual knowledge" present only in "extreme circumstances," *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 537 (Ct. App. 1998), and have refused to hold banks liable in far more egregious cases than this. *See Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1145 (2005). They would not find "actual knowledge" in this case.

Accordingly, I dissent.