**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

CRAIG M. PLUMLEY; et al.,

        Plaintiffs-Appellants,

  v.

SEMPRA ENERGY; et al.,

        Defendants-Appellees.

No.   19-55121
       19-56216

D.C. No. 3:16-cv-00512-BEN-AGS

MEMORANDUM*

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted February 8, 2021
Pasadena, California

Before:     TALLMAN, CALLAHAN, and LEE, Circuit Judges.

In these consolidated appeals, Craig Plumley, individually and on behalf of a

putative class of shareholders, challenges the district court's dismissal of his

securities fraud complaint against Sempra Energy, Southern California Gas

Company ("SoCalGas"), and two individual defendants, Debra Reed and Dennis

---

    *     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Arriola[1] (collectively, "Defendants"), under Sections 10(b) and 20(a) of the Securities Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plumley also challenges the district court's denial of two post-judgment motions to reconsider and its denial of leave to further amend after two previous attempts failed.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Plumley's suit stemmed from alleged material misstatements made by Defendants before and after a massive natural gas leak from the Aliso Canyon gas storage reservoir near Porter Ranch northwest of Los Angeles that began in October 2015 and continued until February 2016.  The leak released tens of thousands of metric tons of methane into the air, and nearby residents complained of impacts on their health.  On January 6, 2016, then-Governor Jerry Brown declared the situation an emergency.  His proclamation triggered a 7% drop in Sempra's stock price, which fell from $93.51 per share on January 6 to $87.00 per share at close of trading on January 7.[2]

We review the district court's dismissal of Plumley's Second Amended

---

[1] During the class period at issue in this case, Debra Reed was Sempra's Chairwoman and CEO, and Dennis Arriola was SoCalGas's Chairman, President, and CEO.

[2] Because the parties are familiar with the facts, we will further recite only those necessary to decide these appeals.

Complaint ("SAC") de novo, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014), and its denial of leave to amend for abuse of discretion, *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002). We accept the SAC's factual allegations as true, but securities fraud claims also must meet the exacting pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act. 15 U.S.C. § 78u-4; Fed. R. Civ. P. 9(b); *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007)).

To survive dismissal Plumley must plead sufficient facts giving rise to a "cogent and compelling" inference that Defendants made a material misrepresentation or omission (i.e., falsity) with intent or "deliberate recklessness" (i.e., scienter) in connection with the purchase or sale of securities. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1052–53 (deliberate recklessness must "present[ ] a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" (citation omitted)). The district court dismissed the SAC for failure to adequately allege scienter. Whether taken individually or evaluated holistically, we agree with the district judge that the allegations in the SAC fail to support a strong inference that Defendants acted with scienter. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009).

Plumley alleges that Defendants were financially motivated to withhold information that the leaking well at Aliso Canyon lacked a sliding sleeve valve or shutoff valve because they would be subject to significant fines and penalties if found to be non-compliant with regulations and safety rules, they wished to secure a rate hike in November 2014, and they wished to offer and sell corporate notes worth $750 million in November 2015. But the SAC is deficient for failing to allege who within Sempra or SoCalGas knew, or were deliberately reckless in not knowing, about the lack of a sliding sleeve and shutoff valve and who chose to withhold that information to avoid fines or obtain a rate increase. Without more specific and particularized allegations of knowledge or deliberate recklessness, these claims of financial motivation "speak to precisely the 'routine corporate objectives such as the desire to obtain good financing and expand' that we have rejected in the past." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (quoting *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012)).

The SAC also lacks specific and particularized allegations about who knew and was responsible for omitting any mention of the leak from the prospectus for the November 2015 note offering. By the time the prospectus was filed, the existence of the ongoing leak at Aliso Canyon was already public knowledge. We therefore cannot say that failing to discuss it in the prospectus was "so dramatically false" as to lead to a strong inference of corporate scienter. *In re NVIDIA Corp.*

4

*Sec. Litig.*, 768 F.3d at 1063. Moreover, although several early top-kill efforts had failed by the time the prospectus was filed, it is not clear from the SAC that by November 2015 it was apparent to company officials that all subsequent top-kill efforts would also prove unsuccessful, making a prompt remedy of capping the leak impossible. *See id.* at 1050, 1063 (refusing to find corporate scienter based on SEC filings between November 2007 and May 2008 when the scope of the problems was not apparent until July 2008).

Nor do we draw a strong inference of scienter from the fact that, on January 4, 2016, Reed received her largest stock payout since becoming Sempra's CEO in 2011, and immediately sold half of those shares two days before Sempra's share price fell following the Governor's emergency proclamation.[3] Although insider trading may demonstrate scienter, a plaintiff must allege "unusual or suspicious stock sales." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (internal quotation marks omitted). Here, Reed's sales were consistent with her prior trading history, both in timing and in percentage of shares sold. *See id.* The more reasonable inference to draw is that Reed followed her usual practice with respect to selling a portion of her stock in 2016 to pay her tax liability on the additional income, not that she was tipped off in advance by the Governor's sister.

---

[3] According to Plumley, Reed must have learned through Governor Brown's sister, a member of Sempra's board, that Governor Brown intended to declare a state of emergency.

We reject Plumley's argument that an intent to deceive can be inferred from Defendants' weekend delay in officially reporting the gas leak to all required regulatory agencies, door-to-door visits to nearby residents to inform them that the gas leak did not present a risk to their health, alleged attempt to suppress media coverage,[4] or statement in an October 30 press release that Defendants "expect this situation to take another week or longer to resolve." These allegations are insufficiently specific and particularized; further, the more reasonable inference to draw from the facts alleged is that Defendants spent the weekend investigating the source of the leak, reassuring concerned nearby residents, and trying what they no doubt hoped would be a successful top kill, rather than intentionally (or deliberately recklessly) seeking to mislead investors and the general public. *See, e.g.*, *City of Dearborn Heights 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) ("[A] motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." (quoting *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (internal quotation marks omitted))). Nor is it evident from the allegations before us that any unnamed company

---

[4] Plumley relies for this allegation on a notation in an October 25, 2015 report to the California Public Utility Commission that reads: "No ignition, no injury. No media." This notation is more reasonably understood as informing the Commission that no media had yet reported on the leak, not that Defendants were working to suppress coverage.

decisionmaker was aware, at the time they were made, that assurances as to the lack of health risk or that stopping the leak would take "a week or longer" were false. *See Ronconi*, 253 F.3d at 430 (noting "no facts are alleged in the complaint that would support an inference that the company's more optimistic predictions were known to be false or misleading at that time by the people who made them").

The allegation that Defendants knew the leak "contained hazardous materials" but failed to disclose both the leak and the "release of the Air Pollutants to the public" is wholly conclusory and does not support a strong inference of scienter. Similarly, Plumley's allegation that "Defendants also knew of the serious health impacts being experienced by area residents very shortly after the Gas Leak began" is insufficiently specific and particularized. The facts alleged in the SAC do not show when Defendants learned of the complaints reported to the South Coast Air Quality Management District, nor is it clear from the SAC when Defendants allegedly became aware of the mounting complaints and how that timing related to their ongoing public statements about health risks. Plumley's further contention that Defendants' shifting post-leak statements about potential health impacts evince an intent to mislead more reasonably supports the inference that Defendants were updating their communications to the public as they learned new information over time through air monitoring and health complaints. No strong inference of scienter can be drawn from these allegations.

7

Plumley's claims that Defendants' delay in reporting the leak slowed evidence collection, that Defendants refused to ensure evidence was preserved, and that they initially did not allow a third-party researcher to conduct low-altitude fly-overs of Aliso Canyon to take air quality readings similarly do not support a strong inference of scienter. Plumley fails to allege knowledge or deliberate recklessness by specific Defendants, and there is nothing beyond supposition to suggest that the weekend delay in reporting was engineered by them to delay evidence collection and ultimately mislead investors. The statement by Arriola that the number of people on site and the urgency to close the leaking well might affect evidence preservation efforts is more reasonably understood not as a refusal to preserve evidence but as a realistic assessment of the chaotic situation on the ground and the inevitable alteration of conditions on the scene as they tried to do so. In our view, the inference that Defendants would not permit low-altitude fly-overs of the site as part of a cover-up is not more compelling than their explanation that initially they were concerned about distracting workers on the ground, potential safety risks, and subsequent liability.

As for Plumley's allegations that Defendants resisted directives from the Los Angeles County Department of Public Health ("L.A.D.P.H.") and understated the quantity of methane released by the leak, the SAC again lacks specificity. It is not apparent from the complaint who within Sempra or SoCalGas responded in the

8

manner alleged in the statements reported by Angelo Bellomo from L.A.D.P.H., or when these interactions allegedly occurred. Plumley points to differences between methane leak estimates by the California Air Resources Board and SoCalGas's own estimates, and he describes how his own expert calculated probable methane quantities. But he does not plausibly allege facts tending to show that Defendants had access to data leading to different calculations or knew their estimates were either wrong or so wide of the mark as to constitute an "extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

We reject Plumley's contention that knowledge of all of the foregoing should be imputed to Reed and Arriola under the core operations doctrine. Absent allegations of specific admissions by Reed or Arriola of detailed involvement in the minutia of the companies' well operations or witness accounts of the same, Plumley cannot prevail by simply incanting this theory. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Nor is this one of the "rare circumstances" where the nature of the facts alleged are "of such prominence that it would be absurd to suggest that management was without

9

knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (internal quotation marks and citation omitted).

Considering the allegations in the SAC collectively, "a reasonable person [would not] deem the inference of scienter at least as strong as any opposing inference." *Tellabs, Inc.*, 551 U.S. at 326. All told, the SAC plausibly alleges Defendants knew that the leaking well lacked a safety valve and that they had a financial motive and opportunity to omit this information from rate increase applications, the November 2015 prospectus, and public statements about the estimated time to stop the leak. That being said, allegedly inaccurate public statements about the scope and health effects of the leak, a short delay in reporting the leak to every regulatory agency ultimately involved, and some indication that Defendants may have relied on low-end calculations of methane release do not make the allegations of scienter "cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

Next, the district court's decision to dismiss the SAC without leave to amend was not an abuse of discretion. At the time the court ruled, Plumley could only speculate that the forthcoming Root Cause Analysis Report might lead to new allegations. It was reasonable at this stage for the court to determine that the prejudice to Defendants in having to defend against a third complaint after having already twice prevailed on motions to dismiss outweighed Plumley's speculation

that at an undetermined time in the future he might be able to allege new facts. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).

Finally, the district court did not abuse its discretion in twice denying reconsideration, relief from judgment, or further leave to amend under Rules 59(e) and 60(b) in response to Plumley's proffer, first, of preliminary results from the Root Cause Analysis, and second, of the finalized Report. Although the Report may well have shed light on what caused the gas leak and failed top-kill efforts, our review of Plumley's proposed—and then revised proposed—third amended complaint convinces us that the Report does little to strengthen the inference that Defendants acted with the intent to deceive investors or with reckless disregard of the risk of doing so. Plumley still fails to plead particularized facts indicating which specific corporate persons knew the alleged statements were false or intended to mislead investors or the public at the time they were made, or to identify any particular Defendant who made a false or misleading statement.[5]

Plumley's two motions to take judicial notice on appeal, Dkt. Nos. 30 and 59, are DENIED. *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

---

[5] Plumley has failed sufficiently to allege primary violations of Section 10(b) or Rule 10b-5; therefore we affirm the dismissal of his Section 20(a) claims. *See Webb*, 884 F.3d at 858.

11

**AFFIRMED.**